UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>EVEREST CROSSING, LLC,<br><br><br>Debtor. | Case No. 09-16664 (FJB)<br>Chapter 11 |

## OBJECTION OF CRIMSON GALERIA LIMITED PARTNERSHIP TO DEBTOR'S MOTION TO ASSUME LEASE

Crimson Galeria Limited Partnership ("Crimson" or the "Landlord") hereby respectfully objects to the *Motion to Assume Lease* filed by Everest Crossing, LLC, the debtor in the above-captioned Chapter 11 case (the "Debtor") on February 3, 2010 (the "Motion"). Through its Motion, the Debtor seeks to assume its non-residential lease with Crimson dated December 20, 2004 (as amended, the "Lease"). A copy of the Lease is attached as Schedule 1 to the *Affidavit of Raj Dhanda dated February 17, 2010* (the "Dhanda Affidavit"), which is attached hereto as Exhibit A. Presently, the Debtor does not have the financial ability to cure the monetary arrears under the Lease, which has 5 years remaining on its initial term. Instead, the Debtor seeks to cure these arrears over an eighteen 18 month period. What the Debtor proposes in its Motion does not constitute a "prompt cure" under section 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). More importantly, however, the Debtor's own projections fail, once adjusted to take into account cure and other payments omitted therefrom. On the face of the projections, and without questioning the Debtor's revenue assumptions, the math simply does not work as demonstrated below. Accordingly, the Debtor's Motion must be

denied. In further support of this Objection, Crimson states as follows:

1. Crimson admits the allegations set forth in Paragraph 1 of the Motion.

2. Crimson admits the allegations set forth in Paragraph 2 of the Motion.

3. Crimson states that Paragraph 3 of the Motion contains a legal conclusion to which no response is warranted.

4. With respect to the first sentence of Paragraph 4 of the Motion, Crimson admits that it advised the Debtor that the total unpaid amount relating to the Lease during the period of May 2005 through December 2009, was $157,268.73 pursuant to a reconciliation spreadsheet, as revised, provided to the Debtor setting forth the various obligations relating to the Lease and the amounts paid by the Debtor to Crimson that cleared (i.e., did not "bounce") (the "Reconciliation"). Crimson further states that the Reconciliation, which is discussed more extensively below, speaks for itself. Crimson denies the second sentence of Paragraph 4 of the Motion and states that the projections attached to the Motion as Exhibit A speak for themselves. With respect to the remainder of the allegations set forth in Paragraph 4, Crimson is without sufficient information or belief to respond to the beliefs of the family of the Debtor's principal regarding the reasonableness of the projections and their ability to provide additional funding to the Debtor and, therefore, denies the same.

5. Crimson admits that the Debtor has been paying over $3,000 a month on the promissory note made by the Debtor to Crimson, which is secured by a pledge of the Debtor's liquor license. With respect to the remainder of the allegations set forth in Paragraph 5, Crimson is without sufficient information or belief to respond and, therefore, denies the same.

6. Crimson states that Paragraph 6 of the Motion contains a legal conclusion as to the amount of time proposed by the Debtor to cure arrears. No response, accordingly, is

warranted. Crimson denies the remainder of the allegations contained in Paragraph 6 of the Motion.

       7.       Crimson denies the allegations set forth in Paragraph 7 of the Motion.

       8.       Crimson states that the first sentence of Paragraph $9^1$ of the Motion contains a legal conclusion to which no response is warranted. Crimson denies the balance of the allegations set forth in Paragraph 9 of the Motion.

       9.       Crimson submits that Paragraph 10 contains no allegation supporting the relief requested in the Motion and, therefore, no response is required.

In further support of this Objection, Crimson states as follows:

## I. BACKGROUND

A.    The Bankruptcy Case

      10.      On July 15, 2009, the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code.

      11.      The Debtor has yet to file a disclosure statement or plan of reorganization and no bar date for the filing of proofs of claim has been established.

      12.      The initial deadline for the Debtor to assume or reject the Lease was November 12, 2009. The Debtor filed a *Motion to Extend Time to Assume or Reject a Non-Residential Real Estate Lease* on or about November 4, 2009 (the "First Extension Request"). The Court extended the initial deadline on an interim basis through the date of the disposition of the First Extension Request pursuant to Rule 6006-1(b) of the Local Rules of the Bankruptcy Court for the District of Massachusetts.

---

[1] There is a numbering error in the Motion and Paragraph 8 has been omitted.

13.     The Court entered an Order regarding the First Extension Request on or about November 24, 2009, granting a 90-day extension of the 120-day period to assume or reject the Lease through February 10, 2010 (the "<u>210 Day Deadline</u>").  The 210 Day Deadline has been extended by agreement through February 24, 2010.

B.     <u>The Landlord's Claim</u>

14.     Throughout the course of these proceedings, and again in its Motion, the Debtor has beaten a drum to the effect that the amount it owes to Crimson is substantially less than the amount alleged by Crimson.  The Debtor, however, has not come close to demonstrating that this is, in fact, reality.  During the case, the Debtor sought to retain the services of an accountant to examine the historical common area and maintenance ("<u>CAM</u>") charges despite unambiguous language in a "sunset" provision in Section 2 of Article VI of the Lease which forecloses any such challenge[2] and even went so far as to allege that Crimson had committed fraud with respect to these charges.  The Debtor consistently likened the CAM charges to a "black box" that it had to "break", the upshot of which would be that the Debtor would demonstrate that it owes the Landlord substantially less than the amount alleged by the Landlord.  *Transcript of November 3, 2009 Hearing on Motion to Employ Accountant and Pay Retainer of $10,000*, p. 32, line 12 through p. 33, line 2.

15.     To counter the Debtor's baseless allegations, Crimson, among other things, informed the Debtor that it was preparing a master reconciliation that set forth the Lease obligations charged to the Debtor each year and the payments received in that year which

---

[2] The Landlord understood that the accountant employed by the Debtor would seek to reconcile payments made by the Debtor on account of its obligations relating to the Lease and Landlord has stated its willingness on several occasions throughout these proceedings to walk the accountant through the Landlord's reconciliation.  However, the accountant does not appear to have been that actively engaged in the reconciliation process.  Moreover, the Debtor has never sought any formal discovery during these proceedings.

cleared. Crimson compiled the master reconciliation with an eye toward reflecting a net aggregate amount owing that the Debtor would easily be able to verify based on its records. In connection with the preparation of the master reconciliation, Crimson made clear that it would answer questions about the reconciliation and, if necessary, provide reasonable access to its books to the accountant in respect of payments received.

16.     Accordingly, on December 31, 2010, the Landlord provided to the Debtor a comprehensive reconciliation, done year by year (broken down month by month), of annual monetary lease obligations against payments made by the Debtor which were not returned (the "First Reconciliation").

17.     For almost a 3 week period after the delivery of the First Reconciliation, the Debtor, despite repeated requests from Crimson, did not raise any issue or pose any questions regarding the First Reconciliation. On January 19, 2010, the principal of the Debtor did have a conversation with the Landlord about a few discrete payments that were not reflected in the First Reconciliation, which led to a revised reconciliation provided to the Debtor on January 22, 2010 (the "Final Reconciliation"). A copy of the Final Reconciliation is attached as Schedule 2 to the *Dhanda Affidavit*.

18.     More than a week following the conversation between Mr. Chowdhury and Mr. Dhanda, the Debtor finally submitted a few questions about the reconciliation on January 27, 2010, and followed up with a few additional questions on January 29, 2010. A copy of the E-mail correspondences from Richard Mucci to Kerry S. Kehoe dated January 27, 2010 and January 29, 2010 are attached as Schedule 1 to the Affidavit of Kerry S. Kehoe (the "Kehoe Affidavit") attached hereto as Exhibit B. The questions are limited in scope and, in some cases, actually result in an increase in the cure amount relating to the Lease.

19.     The Final Reconciliation reflects that the Debtor's cure amount through December 2009 totaled $157,268.73, plus certain charges under the Lease (collectively, the "Cure Arrears"), such as, among other things, amounts due for partial or complete closures pursuant to Article IX, Section 3(i) of the Lease (the "Closure Provision")[3] and Crimson's attorneys' fees relating to the Motion pursuant to Article XVII, Section 24 of the Lease.[4]  In addition, there are certain non-monetary defaults on the part of the Debtor, including failure to provide gross sales information pursuant to Article IV and financial statements pursuant to Article XVII, Section 27 of the Lease (the "Non-Monetary Defaults").  In any event, it is clear that the Cure Arrears is not less than $157,268.73.[5]

C.     The Projections and the Debtor's Future Obligations

20.     The projections attached as Exhibit A to the Debtor's Motion (the "Projections") demonstrate the Debtor's inability to pay the Cure Arrears.  Leaving aside the questionability of the proposed revenue figures provided by the Debtor[6], the Projections, on their face, do not reflect a future ability of the Debtor to pay the Cure Arrears.

---

[3] With respect to the Closure Provision, the Lease provides that "[w]ithout waiving any other rights or remedies of the Landlord set for in this Lease, Tenant will, for any day or fraction thereof during the Term during which the Demised Premises shall not be open for business as provided in this clause pay to Landlord an amount equal to one-tenth (1/10) of the rate of the monthly Minimum Rent then in effect for the month in which such day occurs, in order to partially compensate Landlord for any decrease in value of the Crimson Galeria and any loss of percentage rent from other tenants in the Crimson Galeria." *Lease* at Article IX, section 3(i).  The Landlord believes that the Debtor on numerous occasions has breached the Closure Provision.  That issue will be explored at the hearing on the Motion.

[4]  Sections 24 of Article XVII of the Lease provides as follows:  "[i]n the event that Landlord shall, without any fault on its part, be made a party to any litigation commenced by or against Tenant … Tenant shall pay, as additional rent, all costs, including, without limitation, reasonable counsel fees, incurred or imposed upon Landlord in connection with such litigation, and, as, additional rent, Tenant shall also pay all such costs and fees incurred by Landlord in connection with the enforcement by Landlord of any obligations of Tenant under this Lease." *Lease* at Article XVII, section 24.

[5] The Landlord requested on multiple occasions that the Debtor stipulate to this amount.  The Debtor has not agreed to do so.

[6] The Debtor projects net sales of $150,420 each and every month in its monthly projections for calendar year 2010.  As reflected in the Monthly Operating reports filed by the Debtor for August through December 2009, the average

21. The Projections do not include a line item for the payment of the Cure Arrears, which broken down over the Debtor's proposed 18 month cure period equals a monthly payment obligation of a minimum of $8,737. Based on the Debtor's Projections for the months of January through April 2010, the Debtor will be unable to make the monthly cure payment totaling $8,737. The Debtor is claiming net income for 2010 in the amount of $115,868, which, after applying the yearly payment obligations with respect to the Cure Arrears of $104,844, leaves a balance of $11,024.

22. However, there are additional obligations that the Debtor does not include in its Projections, the net effect of which is to eliminate any positive net income and its ability to pay the Cure Arrears. The Debtor fails to mention the treatment of the obligations due and owing to the Internal Revenue Service ("IRS") and administrative claimants. There is no line item for payment to the IRS despite the fact that the IRS has a secured claim totaling $74,491.12 and an unsecured priority claim in the amount of $13,810.20 as reflected in the Proof of Claim filed by the IRS on or about October 16, 2009. *See* Proof of Claim No. 7. In addition, there is no mention of payment of the priority portion of the Massachusetts Department of Revenue's claim, totaling $14,833.38, nor the secured claim filed by Rewards Network Establishment Services, Inc. ("Rewards Network") totaling $7,709.71. *See* Proof of Claim No. 4 filed by the Department of Revenue on or about September 15, 2009 and Proof of Claim No. 5 filed by Rewards Network on or about September 18, 2009. Moreover, upon information and belief, the professional fees for Debtor's counsel are in excess of $150,000. However, such amount does not appear to be taken into consideration in the Projections.

---

net monthly sales of the Debtor during the post-petition period totaled $146,143, ranging from a low of $124,671 for November 2009 to a high of $164,197 for August 2009.

23. Furthermore, although the Projections appear to double count the trash removal obligation by including an additional line item for waste removal totaling $650 per month, when waste removal is also included in the "CAM & Landlord" charges, the Debtor does not list its obligation for payment of the outdoor area rent under the Lease. Subtracting the trash removal line item totaling $7,800 for 2010 from the outdoor area rent for 2010 totaling $15,755.76, leaves an additional obligation of $7,955.76 that further reduces the Debtor's net income in the Projections.

24. Additionally, the Projections fail to take into account the "Liquor License Fee"[7] after April 2010. The Debtor makes this adjustment because it anticipates purchasing another liquor license from the City of Cambridge and selling its current license at a sum sufficient to payoff the current obligation to the Landlord. Building the continuing obligation to pay the "Liquor License Fee" back into the Projections further reduces the Debtor's net income for 2010 by $25,464. Accordingly, without even taking into account the missing secured and unsecured priority obligations to the IRS, Massachusetts Department of Revenue, and Rewards Network totaling $110,844.41 and the administrative expense claim consisting of the professional fees of Debtor's counsel, the Debtor's net income for 2010 is negative $22,395.76. A copy of a detailed breakdown of the Debtor's payment obligations under the Lease from January 2010 through December 2011 is attached as Schedule 3 to the *Dhanda Affidavit*. The calculation of the Debtor's negative net income for 2010 is attached as Exhibit C hereto.

25. Upon information and belief, the Debtor has a very limited amount of cash on hand, such that it would not be able to absorb consecutive bad months or, for that matter, even

---

[7] In connection with the Lease, Crimson also loaned $250,000 to the Debtor to purchase a license for the sale and service of all alcoholic beverages (the "License") at its restaurant. To evidence the loan, the Debtor executed a Promissory Note dated December 7, 2005 in the original principal amount of $250,000 (the "Note"). The Debtor refers to the Note payments as a "Liquor License Fee" in its Projections.

8

perhaps one bad month of business. In any event, the Debtor has not demonstrated an ability to satisfy the requirements of section 365 in order to assume the Lease, the Debtor's Motion must be denied.

## II. Discussion

26.     There are a variety of restrictions on the debtor's ability to assume an unexpired lease pursuant to section 365. Under section 365(b)(1) of the Bankruptcy Code, before a debtor can assume a lease, the debtor must cure all defaults, or at least provide adequate assurance that defaults will be cured promptly. 11 U.S.C. § 365(b)(1); *see also In re BankVest Capital Corp.*, 360 F.3d 291, 296 (1st Cir. 2004). In addition, the debtor must compensate the landlord for actual pecuniary losses resulting from any default, or, again, provide adequate assurance that such losses will be compensated promptly. Moreover, a debtor must provide adequate assurance of future performance under the unexpired lease it seeks to assume.

27.     Specifically, section 365(b)(1) of the Bankruptcy Code provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

    (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

    (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

    (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

28.     In addition, non-monetary defaults must be cured, to the extent they are not impossible to cure and are not penalty provisions. 11 U.S.C. § 365(b)(2).

29. Under section 365, the Debtor, as the moving party, bears the ultimate burden of production and persuasion that the Lease is subject to assumption and that all requirements for assumption have been met. *See, e.g., In re Rachels Industries, Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990). However, proof of the amount of any monetary default is the responsibility of the non-bankrupt party. *See In re Millivision, Inc.*, 328 B.R. 1, 6 (Bankr. D. Mass. 2005).

A. The Debtor Has Not Provided Adequate Assurance That Defaults Will Be Cured Promptly

30. The Bankruptcy Code does not define "promptly cure" or "adequate assurance" of a prompt cure. Whether a cure is "prompt" for purposes of section 365(b)(1)(A) depends on the facts and circumstances of each case. *In re Embers 86th Street, Inc.*, 184 B.R. 892, 900 (Bankr. S.D.N.Y. 1995). While it is difficult to conclude any bright-line rules from the cases interpreting the term "prompt" for purposes of section 365, the existing authority provides insight into cure proposals that were not workable.

31. The Debtor contends that repayment of cure costs over an 18 month period is prompt for purposes of section 365(b)(1)(A). However, a majority of the cases find that payment must be made on or near the time of assumption. *See, e.g., In re Berkshire Chem. Haulers Inc.*, 20 Bankr. 454, 458 (Bankr. D. Mass. 1982)(proposal to cure over an 18-month period was not prompt); *Cole v. Kramer Suburban Car Wash Enter. Inc.*, 1992 W.L. 62144 (D. Md. 1992) (proposal to cure arrearage over seven-month period did not constitute prompt cure); *In re Fisha Indus. Inc.*, 9 B.R. 834, 835 (D. Nev. 1981) (granting debtor 60 days to assume or reject contract involving lease of bakery equipment if it paid the monetary default immediately upon assumption and all lease payments were paid promptly during such period); *In re Bronx-Westchester Mack Corp.* 4 B.R. 730, 734-35 (Bankr. S.D.N.Y. 1980) (monetary defaults under

distributor agreements were to be paid immediately or debtor was to provide adequate assurance in the form of cash or collateral that was nonspeculative, positive and sufficiently substantial).

32.    In the *Berkshire Chem. Haulers* case, the Bankruptcy Court for the District of Massachusetts rejected the debtor's proposal in that case to cure the arrearage over an 18-month period. *See Berkshire Chem. Haulers Inc.*, 20 Bankr. at 458. While the Court was reluctant to propose a bright-line rule, it examined the parameters of a "prompt cure" based on the circumstances of the case before it stating that while a debtor with "90 years remaining on a 99 year lease, who proposes to cure its arrearage by monthly payments over an 18 month period, might be found to have offered adequate assurance of a prompt cure[,] …. where in this case the debtor's offer to cure its lease default over the next 18 months contemplates the final payment being made contemporaneously with the expiration of the lease term, I cannot say that any Court, under any circumstances, would find that such a proposal qualifies as a 'prompt' cure under § 365(b)(1)." *Id.*

33.    The Debtor cites only one case in support of its contention that the proposed 18 month repayment period provides a prompt cure, *In re Whitsett*, 163 B.R. 752 (Bankr. E.D. Penn. 1994), the facts of which are inapposite to the circumstances in the present case. The case of *In re Whitsett* involved an individual debtor tenant seeking the assumption of a lease of federally subsidized housing. Under the circumstances, the Court found the tenant's offer to cure her rent deficiency over "slightly less than two years" constituted reasonably prompt cure with the added condition that "the Debtor must include provisions in her plan requiring that she pay at least $100 to the Trustee monthly; that she remain current on her rent and plan payments for two years after confirmation of her plan; and that, if she fails to do so, her bankruptcy case will be dismissed and no further case may ne filed for 180 days." *Whitsett*, 163 B.R. at 755. In

examining the unique circumstances in the *Whitsett* case, the Court found the fact that the lease at issue involved federally subsidized housing significant because " certain 'layers of protection' for the Debtor's leasehold interest attach." *Id.* The non-residential Lease at issue in the present case is far different from the lease and related circumstances at issue in the *Whitsett* case.

34.     Moreover, while the *Whitsett* court also noted in dicta that "despite the presence of few cases so allowing, a period of time in excess of a year could be prompt depending on the circumstances," such circumstances are not present here. *Whitsett*, 163 B.R. at 755 (*quoting In re Gold Standard at Penn, Inc.*, 75 B.R. 669 (Bankr. E.D. Pa. 1987) citing *In re Coors of North Mississippi Inc.*, 27 Bankr. 918 (Bankr. N.D. Miss. 1983)). In the *Coors* case, the Court allowed a three-year cure period with respect to the assumption of a beer distributorship agreement, focusing on the fact that the non-debtor party had acted inequitably by compelling the debtor to pay a surcharge of $0.50 per case of beer to reduce its prepetition arrearage by approximately $50,000 by the time the Debtor proposed to assume the contract. *In re Coors*, 27 Bankr. at 920. The Court also noted that the cure period represented "a comparatively short period of time as it relate[d] to the prospective longevity of successful business operation[s]" contemplated by the proposed cure. *Id.* The *Coors* decision, however, has been criticized by commentators as "a significant departure from the majority rule and [one that] represents the dangers inherent in equitable attempts to rewrite contractual provisions to suit some abstract notion of fairness." Richard Epling, *Contractual Cure in Bankruptcy*, 61 Am. Bankr. L. J. 71, 76-77 (1987). There is no allegation by the Debtor in its Motion that Crimson has acted inequitably in connection with the arrears owed by the Debtor.

B.      The Debtor Has Failed to Demonstrate Adequate Assurance of Future Performance

35. In addition, there is nothing in the evidence to ensure the Court that the Debtor will provide adequate assurance of future performance. As stated by the *Embers* court, in assessing adequate assurance of future performance under section 365(b)(1)(C), the "test is not one of guaranty, but simply whether it appears that the rent will be paid and other obligations met." *Embers*, 184 B.R. at 902 (citations omitted). Thus, while adequate assurance does not require a guaranty of future performance, there must be a firm commitment by the debtor to cure the default and a reasonably demonstrable capability that it can do so. *See id.* Adequate assurance requires a foundation that is non-speculative, positive and sufficiently substantial so as to assure the non-debtor party that it will receive the amount of the default. *See Bronx Westchester Mack Corp.*, 4 B.R. at 734-35.

36. In the *Embers* case, the Court found that the debtor's projected net profit is at best speculative, being based upon a proposal to improve profitability for offering reduced services at increased prices in leased space which will not allow it to substantially increase sales. *Embers*, 184 B.R. at 902. A similar conclusion can be drawn from the Projections provided by the Debtor.

37. The Debtor's Projections, which only break down calendar year 2010 on a monthly basis, instead of the entire proposed 18-month cure period, are speculative and lack certain key payment obligations. As noted above, without taking into account obligations due and owing to the IRS, Department of Revenue, and Rewards Network, as well as the administrative expenses claims of the Debtor's professionals, the Projections, revised to include Cure Arrears payments, the difference between the outdoor area rent and the trash removal fee, and Liquor License Fee payments, show negative net income of $22,395.76 for 2010.

38. In addition, while the Debtor allegedly challenges the CAM charges due under the Lease which comprise a portion of the amount to be cured, it is clear that the floor amount at issue is at least $157,268.73 pursuant to the Final Reconciliation. Not only has the Debtor failed to provide any substantive comments to the Final Reconciliation that would lower the floor amount of the arrearage, the Debtor also fails to set forth any theory to disturb the enforceability of the sunset provision in Section 2 of Article VI of the Lease and is, thus, precluded from challenging the historical CAM charges.[8]

39. Moreover, as previously described, the Projections fail to take into account the Liquor License Fee after April 2010. The Debtor makes this adjustment because it anticipates purchasing another liquor license from the City of Cambridge and selling its current license at a sum sufficient to satisfy its obligation to the Landlord. However, the Debtor's theory regarding the proposed sale and purchase of a license is flawed.

40. Bankruptcy Code Section 363(f) permits the sale of estate property pursuant to Section 363(b) "free and clear" of liens, claims, and other interests if at least one of five circumstances described in Sections 363(f)(1) through (f)(5) exists. Debtor has not demonstrated that any of the Section 363(f) requirements could be met under the present circumstances. Moreover, there is no indication that there is a buyer for the Debtor's present license. While the Debtor had previously filed a Motion to Employ a broker, Charles M. Perkins and Boston Restaurant Group, to market its liquor license on or about December 24, 2009, that motion was

---

[8] Any Article VI, Section 2 statement "will be final and binding upon Tenant unless Tenant objects to the same in writing to Landlord within thirty days after it has given notice to Tenant." *Lease*, at Article VI, §2. If a statement reflects an amount owing by the Debtor that is more than the prior year estimated payments, the Debtor is obligated to pay the difference within thirty days of the statement's delivery. *See id.* The Landlord delivered the Article VI, Section 2 statements to the Debtor's listed address of 101 Sawyer Avenue, Dorchester, Massachusetts as set forth in the *Affidavit of Karishma Dhungana dated December 3, 2009* (the "Dhungana Affidavit"), attached as Exhibit B to the *Objection filed by Crimson to the Debtor's Motion to Expand and Clarify the Scope of Services to be Rendered by Accountant* [Docket No. 207].

subsequently withdrawn. More importantly, however, Article XVII, Section 25 of the Lease provides that "[d]uring the Term, Tenant agrees that the License shall not be transferred by Tenant to any location other than the Premises, not may Tenant transfer the license to any person or entity other than Landlord or a transferee approved in advance in writing by Landlord." *Lease* at Article XVII, section 25. Thus, even if the Debtor could somehow find a buyer and sell the current liquor license, notwithstanding the Lease provisions to the contrary and Section 363(f) of the Bankruptcy Code, the Landlord could then move to terminate the Lease because of the default resulting from the sale.

41. The Debtor has admitted that it does not have the cash on hand to cure the Lease arrears under section 365 of the Bankruptcy Code. It has endeavored, instead, to create projections regarding repayment of the CAM charges that fail to take into account all of the Debtor's obligations.

42. The Debtor does not have sufficient funds to cure Lease arrears and has not shown a reasonably demonstrable capability that it can do so in the future. Moreover, there is no indication that the Debtor can cure the Non-Monetary Defaults under the Lease as well.

43. Based on the foregoing, the Debtor's Motion should be denied.

[Remainder of the page intentionally left blank]

WHEREFORE, Crimson respectfully requests that this Court enter an Order denying the Motion and granting such further relief as this Court deems just and proper.

          Respectfully submitted,

          CRIMSON GALERIA LIMITED PARTNERSHIP

          By its attorneys,

          HOLLAND & KNIGHT LLP

          /s/ *Kerry S. Kehoe*
          Kerry S. Kehoe, Esq. (BBO # 552904)
          Gordon P. Katz, Esq. (BBO # 261080)
          Diane N. Rallis, Esq. (BBO # 652203)
          10 St. James Avenue
          Boston, MA  02116
          Ph: (617) 523-2700
          Fax: (617) 523-6850
          E-mail: kerry.kehoe@hklaw.com
          E-mail: gordon.katz@hklaw.com

Dated:  February 17, 2010          E-mail: diane.rallis@hklaw.com

## CERTIFICATE OF SERVICE

I, Diane N. Rallis, Attorney for Crimson Galeria Limited Partnership, hereby certify that on this 17th day of February, 2010, I served copies of the foregoing Objection upon the following parties by first-class mail, postage-prepaid, or via ECF:

| | |
|---|---|
| Herbert Weinberg, Esq.<br>Rosenberg & Weinberg<br>805 Turnpike St., Suite 201<br>North Andover, MA 01845<br>*Via ECF* | Herbert Weinberg, Esq.<br>James L. Rudolph, Esq.<br>James S. Singer, Esq.<br>Rudolph Friedmann, LLP<br>92 State Street<br>Boston, MA 02109<br>*Via ECF* |
| John Fitzgerald, Esq.<br>Eric Bradford, Esq.<br>Office of the U.S. Trustee<br>10 Causeway Street<br>Boston, MA 02222<br>*Via ECF* | Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA 19114<br>*Via regular mail* |
| Isaac M. Gabriel, Esq.<br>Quarles & Brady LLP<br>Renaissance One<br>Two North Central Avenue<br>Phoenix, AZ 85004-2391<br>*Via ECF* | Dan Ryan, Esq.<br>Chief Counsel<br>Internal Revenue Service<br>10 Causeway Street, Room 401<br>Boston, MA 02222<br>*Via ECF* |
| Rewards Network Establishment Services, Inc.<br>Attn: Dick Sandler, Esq.<br>Two North Riverside Plaza, Ste. 950<br>Chicago, IL 60606<br>*Via regular mail* | Solmon Chowdhury<br>37 Moreland Street<br>Roxbury, MA 02119<br>*Via regular mail* |
| Internal Revenue Service<br>Insolvency Group, Stop 20800<br>PO Box 9112<br>Boston, MA 02114<br>*Via regular mail* | Department of Revenue<br>PO Box 9564<br>Boston, MA 02114<br>*Via regular mail* |

| Boston Restaurant Group      | Jonathan O. Yorks                 |
| P.O. Box 327                 | Walter & Shuffain, P.C.           |
| Boxford, MA 01921-0327       | 101 Huntington Avenue, 8th Floor  |
| *Via regular mail*           | Boston, MA 02199                  |
|                              | *Via regular mail*                |

                                       /s/ Diane N. Rallis

# 9149737_v4