# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re<br><br>EVEREST CROSSING, LLC,<br><br>                    Debtor | Chapter 11<br>Case No. 09-16664-FJB |

**MEMORANDUM OF DECISION ON
FINAL APPLICATION OF RUDOLPH FRIEDMANN, LLP, AS COUNSEL TO THE DEBTOR**

This case is before the Court on the application for compensation of the law firm of Rudolph Friedmann, LLP ("RF" or "the Firm"), for its nearly 12 months' service as counsel to Everest Crossing, LLC, the debtor in possession ("Everest").  The application as amended seeks compensation of $198,582.75, reimbursement of expenses of $3,668.28, and a premium of $40,000.  Everest and its sole shareholder, Solmon Chowdhury (collectively, "the Objectors"), oppose the application on numerous grounds, including failures of disclosure, misrepresentations, and abandonment of the debtor in midcase, and ask for disallowance of roughly half the compensation requested and denial of a premium.  They further ask for a determination that the Firm agreed to accept payment of its fee over time and is now bound by that agreement for purposes of plan confirmation.  After an evidentiary hearing and for the reasons set forth below, the Court will allow total compensation in the amount of $100,000, deny the balance and any premium, and, in lieu of even more severe disallowance of compensation, permit payment of this administrative claim over a period of 24 months.

**FACTS AND PROCEDURAL HISTORY**

Everest, which operates a restaurant in Cambridge, Massachusetts, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 15, 2009.  Its financial troubles are largely attributable to its relationship with its landlord.  To address those troubles, the firm retained RF in April,

2009.  The firm commenced work on landlord and lease issues immediately; by the time of the bankruptcy filing, the firm had expended approximately forty hours on Everest's affairs, for total fees of $17,282.50.  During this period, the firm also represented Everest's president and sole shareholder, Solmon Chowdhury, in litigation commenced by the landlord against both Everest and Chowdhury (among others) on issues relating to the lease.   The extent of the fees for which Chowdhury was separately liable for this representation is not in evidence; nor is it at all clear whether Chowdhury was indebted to the Firm for fees at the time.  The record is unclear as to the extent to which RF was paid for the fees owed by Everest before the bankruptcy filing, but it is undisputed both that some payment was made and that a balance remained owing at that time.  RF says the $15,000 had been paid for this service, that a balance of only $483 remained owing upon the filing of the bankruptcy petition, and that the firm "wrote off" this debt before the bankruptcy filing and has never sought payment of it.  I can make no finding as to how much of the prepetition debt had been paid, but I find credible that by "writing off" the balance, RF waived that balance.

  During the bankruptcy case, Everest first filed an application to employ RF on July 31, 2009, the sixteenth day of the case, but this application was not accompanied by the verified statement required by Fed. R. Bankr. P. 2014(a).  Everest filed the same application again on August 3, 2009, again without a supporting verified statement, but filed the supporting statement, the affidavit of Herbert Weinberg, on August 4, 2009.  Everest then filed an amended application with a supporting affidavit on August 17, 2009, and, no objection having been filed, the Court granted this application on August 28, 2009.

  In the affidavits filed by Weinberg on August 4 and August 17, 2009 (except for their dates, the two affidavits appear to be identical), he recites that "my and Rudolph Friedmann LLP's connections with the Debtor, any creditor, or other party in interest, their respective attorneys and accountant are as follows:  none"; and "neither I nor any member of Rudolph Friedmann LLP hold or represent any interest adverse to the estate of [Everest Crossing, LLC]."  In neither affidavit does he disclose that the firm was employed by Everest and by Chowdhury during the months before the bankruptcy filing, that

2

the firm received payment for its prepetition service to Everest, that it was owed money by the debtor for that service, or that it had waived its claim for the balance due.

In the amended application of Everest to employ RF, which was filed on August 17, 2009 and which is signed by Chowdhury himself, Chowdhury stated: "Rudolph Friedmann LLP has not represented the Debtor or any known creditor of the Debtor or party in interest." Likewise, in the two earlier versions of the application to employ RF, Chowdhury made the same statement. Chowdhury offered no testimony at the evidentiary hearing to reconcile these averments, which I find he must have known to be false, with his current protestations about RF's failure to disclose connections to Everest and to himself.

There are discrepancies as well about the amount that RF was paid as a retainer for service in the case (not for its prepetition service). In Everest's original application to employ RF, which Chowdhury signed and attorney Weinberg filed electronically,[1] Chowdhury stated: "Rudolph Friedmann LLP has agreed to represent the Debtor in return for a retainer of $29,931.00 of which $27,431.00 was paid by the Debtor prepetition and $2,500 was paid postpetition by Solmon Chowdhury, plus filing fee of $1,039.00." In Everest's amended application to employ, which again Chowdhury signed and attorney Weinberg filed electronically, Chowdhury uses the same words but different numbers: "Rudolph Friedmann LLP has agreed to represent the Debtor in return for a retainer of $19,931.00 of which $17,431.00 was paid by the Debtor prepetition and $2,500 was paid postpetition by Solmon Chowdhury, plus filing fee of $1,039.00." The latter position is consistent with the numbers set forth in Rule 2016(b) statement of compensation that attorney Weinberg signed and filed on August 13, 2009. Neither Chowdhury nor Weinberg attempted to explain this discrepancy at the evidentiary hearing.

---

[1] By the local rules governing electronic filing in this district, an attorney's use of his or her user log-in and password in the electronic filing of a document serves as that attorney's signature on the electronically filed document for purposes of Fed. R. Bankr. P. 9011 and any other purpose for which a signature is required. MLBR App. 8, Rule 8(a).

To complicate matters further, Chowdhury made the following representations in an affidavit that Everest submitted in support of its opposition to RF fee application:

> At or around the time of filing of this case on July 15, 2009 the following payments were made to Rudolph Friedmann, LLP: $17,500.00 in money orders: a $10,000.00 credit card payment by a personal friend of mine, Gokulan Thiagarajah; a money order in the amount of $1,039.00 to cover the filing fee; and $3,000.00 in cash picked up at the Debtor's premises by a courier from Rudolph Friedmann, LLP.
> Thus a total of $31,539.00 was transmitted to Rudolph Friedmann, LLP on or around the filing of the petition in this case.
> Prior to that time a $5,000.00 check from the Debtor dated April 30, 2009 was transmitted to Rudolph Friedmann, LLP, and a $5,000.00 check from my personal account was also sent to Rudolph Friedmann approximately a month later for representation of me in a suit on a loan guaranty.

The Objectors did not offer this affidavit at the evidentiary hearing. Nor did they or RF ask either Chowdhury or Weinberg to reconcile these statements with the applications to employ. Where the truth lies is impossible to discern, so I move on.

During the case and from its start, RF found that the case was anything but routine. The Firm invested many hours in one difficult battle after another over virtually the entire year it spent in the case. It worked diligently and invested many hours against a formidable opponent, with no certitude of success, much less of payment for its efforts—it's fair to say the odds didn't favor either success or payment—acquitted itself well in the courtroom, and achieved a commendable result. The Firm did not actually bring the debtor to confirmation but at least made it possible for it to get there, no mean feat.

Notwithstanding its commendable efforts, the Firm did not stay the course. In April, 2010, the landlord made a settlement offer that would have paid all creditors in full, RF included. By this time, the Firm's administrative claim for fees had grown much larger than its retainer, such that, behind the landlord itself, it was probably the largest creditor, commanding a sizable percentage of the debt. Sensing the contingency of Everest's precarious existence, the Firm felt strongly that it would be irresponsible for the debtor not to accept this offer or at least to pursue it further. The offer, however, would have turned control of Everest over to the landlord, and Chowdhury did not want to go in this

4

direction. After much discussion over the issue between Chowdhury and Everest's attorneys at RF, Chowdhury decided not to pursue the offer, and RF decided to withdraw from representation. To that end, it filed a motion to withdraw on June 28, 2010, citing as cause—and rather cryptically and without elaboration—"a fundamental difference of opinion" between the Firm and Chowdhury as to the management of the case, which difference of opinion "precludes [RF] from representing the Debtor in the way the management has directed it." Substitute counsel having already appeared and no opposition having been filed, the motion was allowed on July 7, 2010. Everest contends that RF thus effectively abandoned its client in mid-case, and I find this to be a fair characterization of the Firm's withdrawal.

During the period when this offer was under consideration and RF's continued willingness to stay in the case became a subject of discussion between itself and Chowdhury, Chowdhury asked RF for a statement of account. On May 19, 2011, RF obliged and produced, on short notice and without vetting or editing, an itemized draft statement for total fees from the commencement of the case in the amount of $146,657.25 and expenses (mostly not itemized) of $8,648.25. The statement further indicated that Everest was credited with two payments: a $10,000 credit card payment on July 15, 2009 and a $15,000 payment on August 21, 2009.[2] Attorney Weinberg has explained credibly that he prepared this draft statement in a hurry—he was at the time almost wholly preoccupied with extraordinary family medical concerns—without the usual scrutiny that would accompany a fee application, and that he consequently and mistakenly omitted from the bill several months of his own separately-maintained time entries. He has not elaborated on the magnitude or cause of this error; nor did the Objectors elect to cross-examine him on this issue. After the date of this bill, the Firm did further work and generated additional fees of approximately $8,600 before the date of its withdrawal, and later it incurred fees of $6,076.00 in producing the current fee application.

---

[2] The statement did not indicate the sources of payment.

5

After the Firm's withdrawal, the case went on.  For a spell of many months, Everest and the Debtor proposed a series of competing plans, but neither was able to obtain approval of a disclosure statement as to any of these.  Ultimately, the landlord withdrew its plan from contention, and Everest has now proposed a plan that stands unopposed—except by RF.  The issue is the treatment of RF's administrative claim for fees.  The plan proposes to pay RF's administrative claim over time; RF objects, saying the Bankruptcy Code requires payment in full on the effective date of confirmation.  In addition, Everest states that it cannot confirm the plan it has proposed if RF's application for compensation is allowed in full.  It seeks by its present objection to limit RF's allowed compensation to $100,000, approximately a 50% reduction, and to obtain a declaration that this fee need not be paid in full upon confirmation but may be paid over a period of 24 months, thus effectively subordinating the claim to other administrative claims and to unsecured creditors.[3]  This, says Everest's present counsel, would make confirmation feasible.  A hearing on confirmation of the plan was commenced but has accordingly been continued until after disposition of the fee application.

RF's original fee application sought fees in the amount of $198,216.75, expenses of $3,668.28, and a premium of $40,000.00.  It further recited that the Firm had received a retainer of $19,931.  In a revised fee application that it filed on the eve of the evidentiary hearing, the Firm increased the fee request slightly (and without explanation) to $198,582.75, and the Firm further indicated that, though it stands by its initial position as to the amount of its retainer, for convenience the Firm will not oppose the Objectors' position that the amount was $26,539.00.[4]

---

[3] Under the plan, unsecured creditors will be paid a 100% dividend on the effective date of confirmation.  Other professionals in the case (there are several) will be paid in part at confirmation and, by agreement, in part by deferred payments.

[4] In fact, the Objectors state that RF understates the retainer by $10,000; hence their position is that the retainer was in the amount of $29,931.  They further point out that RF itself had stated, in a bill it submitted to Everest on May 19, 2010, that it had received a retainer of $27,500.  The bill itself does not use the word retainer but indicates that the Firm received a $10,000 credit card payment on July 15, 2009 and a $15,000 payment on August 21, 2009.

Everest and Chowdhury filed a joint objection to the fee application in which they articulated the objections listed and addressed below.  The Court held an evidentiary hearing on the objection at which the court heard the testimony of Solmon Chowdhury for the Objectors and attorney Weinberg for RF.

**DISCUSSION**

    a.  **Compensation for Prepetition Service**

The Objectors first object on the basis that the application seeks compensation for service rendered before Everest filed its bankruptcy petition.  The detailed time entries appended to the application do indeed include fees totaling $17,282.50 for service rendered prior to Everest's filing of its bankruptcy petition on July 15, 2011.  RF concedes that these amounts are not compensable but states that, notwithstanding the appendage of time entries for this period to its application, the prepetition fees are not included in the total fees for which the firm requested allowance.  Upon doing the math, however, the Court finds, dismayingly, that, notwithstanding counsel's representations to the contrary, the prepetition fees are indeed part of the total $198,582.75 being sought.  Without these prepetition items, the fees itemized in the fee application total only $182,569.25.

It being undisputed that prepetition services cannot be allowed as an administrative expense, no prepetition sums will be allowed.  The Court further notes that time entries for the date of the filing, for fees aggregating $1795, indicate that a substantial but unspecified portion of that time was expended before the filing, for example on "further meeting with client to finalize decision to file" and a conference involving three attorneys at the firm "regarding pluses and minuses of filing."  The Court therefore counts only $300 of the amount billed for that day as having been earned after the filing of the petition.

7

### b. Postpetition Service Rendered before Debtor Applied to Employ Counsel

The Objectors next object on the basis that RF may not seek compensation for time expended before the debtor filed a complete application to employ the firm. Everest first filed an application to employ RF on July 31, 2009, the sixteenth day of the case, but this application was not accompanied by the verified statement that is required by Fed. R. Bankr. P. 2014(a). Everest filed the same application again on August 3, 2009, again without a supporting verified statement, but filed the supporting statement, the affidavit of Herbert Weinberg, on August 4, 2009. Everest then filed an amended application with a supporting affidavit on August 17, 2009, and the Court granted this application on August 28, 2009. The Objectors argue that compensation should be denied for service rendered before August 17, 2009. RF concedes that this chronology of events is correct, but argues that compensation should be available from the petition date because (i) Everest's failure to file the application on or before the fourteenth day after the bankruptcy petition was the result of a calendaring error; (ii) other documents in the case were due on July 31, 2009, the day the application was first filed; (iii) under an (unspecified) amendment to Fed. R. Bankr. P. 1007 which has since become effective, the application to employ would have been due on July 31, 2009, with the other documents in the case, thus remedying a trap for the unwary; (iv) no party was prejudiced by the two-day delay; and (v) the operative date should be the date of the original application to employ, not the date of the amended application that was ultimately granted.

Each party has structured its argument around law that each clearly is aware of by neither cites: the decision of the First Circuit Court of Appeals *in In re Jarvis*, 53 F.3d 416 (1st Cir. 1995) and local rule MLBR 2014-1(d). *Jarvis* stands for two relevant propositions: that the bankruptcy court may grant an application to employ with retroactive effect only if the delay in seeking approval resulted from extraordinary circumstances; and simple negligence or mere oversight cannot constitute an exceptional circumstance justifying *post facto* approval. Local rule 2014-1(d) is relevant in each of its three sentences:

8

> If a court approves an application for the employment of a professional person, such approval shall be deemed effective as of the date of the filing of the application.  However, if such application is filed within fourteen (14) days from the later of case commencement or the date the professional commenced rendering services, court approval shall be deemed effective commencing the date that services were first rendered.  Approval shall not be otherwise retroactive absent extraordinary circumstances.

MLRB 2014-1(d).

On the basis of *Jarvis*, the Court holds that the calendaring error that resulted in failure to file the application within the 14-day grace period afforded by the local rule is not an extraordinary circumstance.  The Court further holds that any changes to Rule 1007 after the expiration of the 14-day period do not change this result, first because (as RF points out) they were not in place at the relevant time and second because they have nothing to do with the filing of a fee application or the power of a court to authorize employment retroactively.[5]  Nor is it relevant that no party was prejudiced by the short delay; *Jarvis* requires extraordinary circumstances, not lack of prejudice.

The only question remaining is whether the date of approval should run from July 31, 2009, the date on which an application to employ RF was first filed, albeit without a supporting affidavit, or August 17, 2009, the date on which Everest filed the amended application that was granted.  Neither party has cited law for its position.  The Court will use the date of the original application—the Objectors have not shown how the amendments to it are material to the present question—but at the same time recognizes that the application was completed only upon the filing of the necessary supporting affidavit of counsel on August 4, 2009.  Because this date is more than 14 days after the date of the bankruptcy filing, MLBR 2014-1(d) mandates that the approval be deemed effective as of the date of the filing of the application, August 4, 2009, not earlier.  Services rendered before that date, representing further fees of $20,141.00, are therefore not compensable.

---

[55] RF never specifies the amendment on which it is relying.  The Court finds nothing relevant in the current language of Rule 1007.

    c. **Lack of Cooperation in Transition to Successor Counsel**

The Objectors contend that, since RF's withdrawal from representation of the debtor, "there has been a lack of a proper level of cooperation with successor counsel regarding turnover of the Debtor's files." However, the Objectors did not in their objection specify precisely how RF was allegedly noncooperative. Nor have the Objectors adduced evidence to support this allegation. I therefore give no weight to this allegation in the allowance of fees.

    d. **Failure to Object to Landlord's Claim**

The Objectors contend that that RF's representation of Everest during the case was deficient because RF failed to object to the claim of Everest's landlord, resulting in the debtor's payment of a substantial amount to the landlord without benefit of possible offsets. The Objectors have submitted no evidence or argument to support this allegation. Among other things, there is no evidence that any rights against the landlord have been lost or that Everest was in a position to bring this challenge at any time during RF's service. In fact, Everest has since employed special counsel to adjudicate the landlord's claim and Everest's counterclaim, and those matters remain pending. The Objectors have not shown or argued that Everest was prejudiced by the timing of this challenge or the division of labor it represents. RF certainly cannot be faulted for insufficient attention to this case in the year of its service. For these reasons, I find no merit in this allegation of deficient representation.

    e. **Billing Discrepancy**

The Objectors next point out a $52,000 discrepancy between the bill in the amount of $146,657.25 that was given by RF to the debtor on or about May 19, 2010, approximately 40 days before RF's withdrawal from service, and the present application for fees of $198,216.75. With respect to this discrepancy, the Objectors comment that "[t]here is no possible way for such an increase to be the result of a contemporaneous time record," but the Objectors do not further elaborate or offer

10

argument that the bill constitutes cause to disallow some portion of the fee application. They do not indicate precisely how the bill differs from the fee application. They do not allege, at least not expressly, that the fee application either seeks compensation for time not expended or is otherwise false. In response, RF concedes the discrepancy but offers the following explanations: (i) that the bill was a raw and unedited draft, prepared at the debtor's request on short notice, that erroneously omitted several months' time entries of one of the attorneys that staffed the case, and (ii) that RF did not withdraw immediately after this bill was presented, but only upon allowance of its motion to withdraw on July 7, 2010, and a significant part of the discrepancy is for time expended after the period covered by the bill. The Objectors offered no evidence on this issue at the evidentiary hearing, but RF offered the testimony of attorney Weinberg, who credibly substantiated the firm's explanation. In view of the paucity of developed argument from the Objectors on this issue and the credible response of the firm, the Court finds that the discrepancy is not cause to disallow fees. Having said this, the Court finds it disturbing that a "raw and unedited" draft bill, usually meaning a bill that includes time charges for excessive and inefficient entries, in this case resulted in a bill that failed to include contemporaneously recorded time entries.

      **f.  Agreement for Deferred Payment**

The Objectors ask that the order allowing the fee application also permit Everest to pay the fee not in full upon confirmation of its chapter 11 plan , as 11 U.S.C. § 1129(a)(9)(A) requires with respect to administrative claims, but over time. The Objectors argue that this treatment is permissible because the Firm has contractually agreed to this treatment, as evidenced by Everest's First Plan of Reorganization and First Amended Plan, both of which were filed for Everest by RF before it withdrew from representation. RF opposes this treatment, arguing that there is no binding agreement for deferral of fees because (1) the disclosure statements for the original and first amended plans expressly required a separate written agreement, but none was ever executed, (2) the original and first amended plans

11

expressly required, as a condition of deferred payment, that Everest give the Firm a lien on cash, inventory, equipment, furniture, and fixtures, but the present plan does not so provide, and (3) the present plan materially alters the provisions of the original and first amended plans regarding the priority of RF's administrative claim as against unsecured creditors.

Section 1129(a)(9)(A) requires, as a condition of plan confirmation, that "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," the plan must provide that holders of administrative expense claims will receive, "on the effective date of the plan," cash equal to the allowed amount of the claim.  11 U.S.C. § 1129(a)(9)(A).  The issue presented is whether the Firm has "agreed" to a different treatment.  I conclude that it has not.  Insofar as the earlier plans and their disclosure statements are evidence, they uniformly required a written agreement.  The Objectors have adduced no evidence of a written agreement or even alleged that one exists; this in itself is dispositive.  In addition, the current plan materially departs from the lien and priority requirements of the agreement that was contemplated by the earlier plan.  The Court therefore holds that RF is not *contractually* bound to accept payment other than as required by § 1129(a)(9)(A).

### g.  Failure to Disclose Connections and Lack of Disinterestedness

The Objectors next argue that RF's fees should be disallowed in part on the basis that the firm failed to disclose, in the Rule 2014 verified statement filed by attorney Herbert Weinberg in support of Everest's application to employ the firm, several connections to the debtor and its principal:  (i) that the firm had represented Everest before the bankruptcy filing, (ii) that it was owed money by Everest for such representation at that time, (iii) that it had represented Everest's principal, Solmon Chowdhury, before the bankruptcy filing, and (vi) that it was owed money by Chowdhury for such representation at the time.  RF does not deny that it represented Everest and Chowdury prepetition.  It also concedes that it was owed money for these services at the time of the filing but maintains that it had "written-off" this debt before undertaking to represent Everest in the case.  The Firm also contends that it had no

obligation to disclose prepetition representation of the debtor—because prior representation is very common, and the existence of a prior relationship was well known in this case—and that it's representation of Chowdhury was only pro forma, the real party in interest having always been Everest.

Section 327(a) of the Bankruptcy Code permits a trustee—or a debtor in possession, as the equivalent of a trustee in chapter 11, per 11 U.S.C. § 1107(a)—to employ counsel "with the court's approval." 11 U.S.C. § 327(a). Employment may be approved only if the person to be employed does "not hold or represent an interest adverse to the estate" and is a "disinterested person." *Id*.; see 11 U.S.C. § 101(14) for definition of disinterested person. To permit a court and other interested parties to determine whether the person meets these requirement, Rule 2014(a) requires that an application to employ a professional person "shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a).

It is undisputed that RF did not here disclose its connections to the debtor and its principal, not fully or even partially. Whether or not the Court and other parties in interest should simply have assumed, without need of disclosure, that counsel was employed by the debtor prepetition to the extent necessary to effect a bankruptcy filing, nothing else about that representation could have been known. The Court and other parties could not have known, among other things, the duration and extent of any prior representation, the existence of any debt arising from the relationship, whether that debt was waived, the extent and timing of any payment received for past services and any retainer for future service, and the source of payment. In this instance, none of this was known or could fairly have been assumed to be known. Nor does it suffice to say, with respect to RF's representation of Solmon Chowdhury, that it was only "pro forma"—it is not clear what counsel even means by this phrase in this context—as if Chowdhury had no real interest at stake and had not really been a client of the Firm. The fact remains that Chowdhury was himself a client of the firm, and no less so because the subject matter

13

of the representation was related to Everest's lease.  This relationship to an insider of the debtor was potentially disqualifying and should have been disclosed.

In addition, Everest's original and two amended applications to employ the Firm went beyond material omissions to affirmative misrepresentations.  In each, Solmon Chowdhury and attorney Weinberg of RF affirmatively represented that "Rudolph Friedmann LLP has not represented the Debtor or any known creditor of the Debtor or party in interest."  This was false on two counts.  The Firm had represented the debtor, and the Firm had represented Chowdhury, who as Debtor's president and sole shareholder was a party in interest.  The applications were signed by Chowdhury and, by virtue of his electronic filing of the applications, are also deemed signed by Weinberg.[6]  The Firm offered no explanation for these misstatements.  I am hard-pressed to conceive of an explanation, short of gross negligence, by which the Firm can have filed three applications to employ and two verified statements, each with material omissions or misrepresentations about the existence of prior representation.

I go on to the questions of disinterestedness and disqualification.  The Objectors contend that the Firm's prior representation of Everest and Chowdhury rendered the Firm not disinterested and thereby absolutely disqualified from employment.  The Objectors provide little or no elaboration on this argument.

In order to qualify for employment under § 327(a), a professional must be a disinterested person.  11 U.S.C. § 327(a).  "Disinterested person" is a defined term.  Two parts of its definition are relevant.  First, it means "a person that is not a creditor."  11 U.S.C. § 101(14)(A).  "Creditor" too is a defined term, meaning "entity that has a claim against the debtor."  11 U.S.C. § 101(10)(A).  I have found that before it undertook to represent Everest in the case, RF waived any claim against Everest that it had

---

[6] MLBR APP. 8, Rule 8(a) states:

> The user log-in and password required to submit documents to the ECF System serve as the Registered User's signature on all electronic documents filed with the Court. They also serve as a signature for purposes of Fed.R.Bankr.P. 9011, the Federal Rules of Bankruptcy Procedure, the local rules of this Court, and any other purpose for which a signature is required.

at that time. Therefore, the Firm was not a creditor and not disqualified as a creditor. And any claim that RF may have had against Chowdhury—none has been proven—would not have made RF a creditor because Chowdhury was not the debtor.

This does not end the inquiry. "Disinterested person" also means "a person that does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C). The Court is not aware of any manner in which the prior representation of Everest and Chowdhury rendered the interests of the Firm materially adverse to those of the various entities with which § 101(14)(C) is concerned. Its obligations to Chowdhury might conceivably have created an adverse relationship, but, as it happens, Chowdhury's, Everest's, and the estate's interests have remained consonant and aligned. The Objectors have not raised specific concerns in this regard, have cited no actual conflict of interest, and indeed have not cited § 101(14)(C) at all. I therefore conclude that the undisclosed connections did not disqualify the Firm from employment as counsel to the debtor in possession.

There remains the question of whether the failures of disclosure and affirmative misrepresentations are themselves cause to disallow some portion of the fee. "Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed at their own risk." *Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994). In *Rome*, the Court of Appeals held that failure to make timely and spontaneous disclosure of a disqualifying conflict was cause to deny a fee application in full, but the Court expressly declined to adopt a *per se* or brightline rule invariably requiring denial of all compensation. *Id*. at 62. Here, we have no actual conflict of interest or otherwise disqualifying connection, "only" failures of disclosure and affirmative misrepresentations about relevant connections and potential conflicts of interest. These in themselves may warrant denial of compensation. Thus, in *Rome v. Braunstein*, 19 F.3d at 59, the First Circuit cited approvingly the case of *In re Roger J. Au & Son, Inc.*, 71 B.R. 238, 242 (Bankr. N. D. Ohio

1986), for the proposition that failure to disclose facts material to a potential conflict may provide a totally independent ground for denial of fees, quite apart from the actual representation of competing interests.  See also *In re Guard Force Management, Inc.*, 185 B.R. 656 (Bankr. D. Mass. 1995) (denying all compensation for egregious failure to disclose all information pertinent to decision to allow employment of counsel).

The undisclosed connections in this case represented potential conflicts of interest, and the result of nondisclosure was that the Court approved Everest's retention of the Firm and monitored the Firm's conduct during the case without knowledge of highly relevant connections.  Even where nondisclosure is not accompanied by a disqualifying conflict, it is not the case that nondisclosure is harmless.  For example, by the Firm's own admission, the prepetition transactions among the firm, Everest, and Chowdhury are even today less than clear.  Without proper disclosure, interested parties had no knowledge that these transactions existed or might warrant examination.

More important than the connections themselves in this case is the pattern, extent, even habit of nondisclosure and misrepresentation exhibited in the applications to employ and supporting verified statements.  This was not a one-time oversight but five separate documents including both omissions and affirmative misrepresentations.  Nor were these oversights about minutiae that counsel might easily have missed.  These were direct representations, clearly and concisely going to the heart of the matter, by persons who cannot possibly plead ignorance of the facts, and all plain wrong.  Yet no explanation has been offered.  The error was compounded in this fee application process by counsel's misrepresentations to the court that prepetition fees were not part of the total compensation being requested.  At best, these omissions and misrepresentations represent gross negligence.  The Court cannot overlook these or treat them as ordinary course of business, and therefore the Court cannot but further disallow compensation.  I conclude that the Objectors are well-justified in their request that allowed fees and expenses be limited to a total of $100,000.  In fact, the consequences of the misrepresentations could and might well have been much worse had the Objectors not limited their

16

request to a reduction to $100,000.  In lieu of further limitation of the allowed amount of the Firm's administrative claim, and notwithstanding § 1129(a)(9)(A), the Court will, in addition to limiting the claim to $100,000, effectively subordinate the allowed claim to other administrative and unsecured claims by granting the debtor leave to defer payment of the sum.  The precise details of that deferment will be addressed at the confirmation hearing.

### h.  Premium

The Firm asks for a premium of 20% over its billed fees, or $40,000, but, despite this extraordinary request, has not addressed the law governing when a premium is appropriate.  Neither will the court, because the issue is not a close one.  However meritorious its handling of the case over its first ten months, no premium is appropriate where counsel (i) so grossly misrepresented the extent of its connections to the debtor and its principal and (ii) abandoned the debtor in midstream, and where, in any event, (iii) the debtor cannot fund a premium.

### i.  Understatement of Retainer

The Objectors lastly contend that the fee application understates by $10,000 the amount of the retainer the Firm received.  The initial fee application indicated that the firm had received a retainer of $19,931.  In its revised fee application, the Firm stands by this number but, to avoid the need to litigate the issue, will use the figure of $26,539.00, which it says represents the Objectors' position.  The Objectors' position, however, is that the retainer was understated by $10,000.00, thus $29,931.  This is consistent with the amount that was stated in Everest's original application to employ the Firm.  Later versions of the application to employ reduced that number by $10,000, but without explanation, and no explanation has been offered to date.  Also, the draft statement of May 19, 2010, indicates that payment was made of $27,500.  While the record is far from clear on how much was paid as a retainer, the Firm itself first used the number of $29,931 and has offered no reason for its later reduction of this

17

number.  Therefore I will use the number that the Firm, as the drafter and filer of the document, placed in the original application to employ, $29,931.

**CONCLUSION**

For the reasons set forth above, a separate order will enter allowing compensation and reimbursement of expenses in the amount of $100,000, crediting against this amount a retainer paid in the amount of $29,931, denying the balance of the compensation requested, and permitting payment of the balance of the allowed fee ($100,000 less the retainer of $29,931, or $70,069) over time.  The order will enter at the time of the order on confirmation of the plan.

Date:  September 16, 2011                    _____
                                             Frank J. Bailey
                                             United States Bankruptcy Judge